IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

BOBBY INGRAM                                                    PLAINTIFF

v.                                           Civil Action No. 3:14-cv-390-TSL-JCG

CAROLYN COLVIN,
Commissioner of Social Security                                DEFENDANT

## REPORT AND RECOMMENDATIONS

Pursuant to 42 U.S.C. § 405(g), the claimant Bobby Ingram seeks judicial review of the decision of the Commissioner of the Social Security Administration denying his claim for Supplemental Security Income benefits ("SSI"). The undersigned submits this Report and Recommendations to the District Judge and recommends that Ingram's Motion for Summary Judgment [11] be denied and the Commissioner's Motion to Affirm [13] granted.

## I. BACKGROUND

A.   Factual Background

On April 1, 2009, Ingram filed an application for SSI, with an alleged disability onset date of January 15, 2009, maintaining that "bipolar personality, anxiety, [and] hallucinations" precluded his ability to work. *Id.* at 256. After school records and IQ testing were obtained, Ingram amended his claim to allege that he meets the listing for mental retardation, 20 C.F.R. 404, Subpt. P, App. 1, § 12.05. Ingram has a history of drug dependence spanning well over twenty years, with his primary drugs of abuse being crystal methamphetamine, cocaine, cannabis, and benzodiazepine. It is Ingram's position that he would be disabled due to mental retardation even if he

stopped abusing drugs and alcohol.  R. [10] at 53-54.

Ingram's birth date is January 15, 1974.  He is forty-one years old and was thirty-five on the alleged onset date in 2009.  Ingram dropped out of school in 1990 before completing the sixth grade.  *Id.* at 309-310.  Ingram was sixteen years old when he dropped out of the sixth grade.  *Id.* at 37, 53, 310, 571.  Ingram testified at a June 2010 hearing before an administrate law judge ("ALJ") that he dropped out of school because he started hanging out with the wrong crowd.  *Id.* at 57, 387.  This is the same report he made to staff at Weems Mental Health Center in 2007: "he reports that nothing really major happened as he was growing up, other than he started running with the wrong crowd, got in trouble, and dropped out of school, etc."  *Id.* at 387, 532.

School records indicate that Ingram failed the first grade, third grade, and sixth grade twice.  *Id.* at 309-10.  Ingram quit school during his third attempt at sixth grade and joined Job Corps.  *Id.*  Ingram testified at a second ALJ hearing in 2012 and reported to medical providers in both 2009 and 2010, that he dropped out of school because he was about to be placed in special education classes.  *Id.* at 56, 435, 456, 482, 512, 571.  On other occasions, Ingram has reported that he actually attended special education classes.  *Id.* at 390, 404, 802.  In his application for SSI, Ingram responded, "no," when asked whether he attended special education classes.  *Id.* at 260.  Ingram's school records do not reflect that he was in special education classes.  *Id.* at 309-10.

Ingram has reported that he began abusing crystal methamphetamine,

cocaine, and alcohol at the age of 16.  *Id.* at 342, 745.  He has also represented that

"[h]e had been using drugs since age 11."  *Id.* at 343.  In 2006, he told a doctor at

South Mississippi State Hospital ("SMSH") that he was arrested for possession of

marijuana at age seven.  *Id.* at 356.  Ingram told a nurse practitioner at East

Mississippi State Hospital ("EMSH") that he "smok[ed] a joint every month and

snort[ed] $25.00 a day of cocaine since age 15."  *Id.* at 381.  In 2008, Ingram told staff

of University of Mississippi Health Care ("UMC") that he was in drug and alcohol

treatment by the age of fifteen.  *Id.* at 544.  In 2012, Ingram told Jennifer Whitcomb,

Ph.D., that he "was a heavy Crystal Meth user at 14 years of age" and had abused

crystal methamphetamine for 23 years.  *Id.* at 795.  Ingram also told Dr. Whitcomb

that he was drug free.  Seventeen days later, Ingram was admitted for the eleventh

time to EMSH, where he tested positive for cannabinoids, crystal methamphetamine,

opiods, and benzodiazepine.  *Id.* at 805.

The medical records reflect that Ingram was first admitted to EMSH in 1994

"on a Chancellor's Decree to the Alchohol and Drug Unit" and remained hospitalized

for twenty days with diagnoses of "cannabis abuse, episodic, and amphetamines or

sypathomimetic abuse, episodic."  *Id.* at 342.  In 1997, Ingram was hospitalized at

EMSH for eight days and diagnosed with amphetamine dependence.  *Id.* at 343.  "At

no time did he show any evidence of psychosis."  *Id.* at 343.  In 1999, Ingram was

hospitalized at EMSH with a chief complaint of "drug problem."  *Id.* at 337.  He

remained twenty-eight days and was discharged with diagnoses of "cannabis

dependence" and "sedative hypnotic dependence."  *Id.*  Ingram showed no evidence of

-3-

psychosis, and his intellectual functioning was found to be average.  *Id.* at 337-38, 340.

In 2000, Ingram was committed and treated at EMSH for nineteen days, where he tested positive for "amphetamines, barbituates, opiates and THC."  *Id.* at 342-44. Ingram was diagnosed with benzodiazepine dependence, and polysubstance dependence, by history.  *Id.* at 344.  "At no time did [Ingram] show any evidence of psychosis."  *Id.*  In 2003, Ingram was committed and treated at EMSH for nineteen days, where he tested positive upon admission for "Benzodiazepines, Cocaine, Opiod, and THC."  *Id.* at 349.  Ingram "denied auditory and visual hallucinations," and he denied suicidal ideation.  He was discharged with diagnoses of benzodiazepine dependence, polysubstance abuse, and substance-induced mood disorder.  *Id.* at 349-51.

In 2006, Ingram was committed for thirty-nine days of treatment at SMSH. *Id.* at 355.  Ingram reported that he had gotten off of his medications and "was hearing voices" telling him to do drugs.  *Id.*  Ingram tested positive for amphetamine, benzodiazepine, cannabinoids, cocaine, and opiates.  *Id.* at 377.  He stated that he had also been using alcohol.  *Id.* at 401.  Ingram was discharged with diagnoses of bipolar disorder, depressed phase without psychotic features; polysubstance dependence; and borderline intellectual functioning.  *Id.* at 355.

In 2007, Ingram was committed upon the affiant testimony of his father who maintained that Ingram was depressed, had suicidal thoughts, and was bipolar.  *Id.* at 379.  Ingram was treated for fifty days at EMSH, where he tested positive for

cannabis and cocaine. *Id.* at 381. Ingram was discharged with diagnoses of recurrent and severe major depressive disorder with psychotic features, and polysubstance dependence. *Id.* "No mental retardation [was] noted." *Id.* at 379.

In July 2008, Ingram was taken to UMC by police after he made superficial cuts to his wrist. *Id.* at 552. Ingram claimed to be hearing voices that were telling him to kill himself. Ingram admitted to recently using cocaine and alcohol but denied crystal amphetamine use over the past four to five months. *Id.* at 511. Ingram told staff that he "drank a 12 pack [of] beer" and "ended up at UMC." *Id.* UMC's records provide: "The patient may be seeking secondary gain and is still requesting controlled substances." *Id.* at 555. Ingram was discharged to EMSH with diagnoses of "polysubstance dependence, paranoid schizophrenia, prior history" and" "borderline personality disorder, by history." *Id.* at 552. He spent twenty-eight days at EMSH and was discharged on August 14, 2008. *Id.* at 537.

Ingram was referred by the Office of Disability Determination Services ("DDS") to psychologist Jan P. Boggs, Ph.D., for a comprehensive mental status examination, which occurred on August 26, 2008. *Id.* at 435. Dr. Boggs' report provides:

> [Ingram] feels that the drugs may have started his psychotic episodes and that his reactions have included panic and rage. Many of these reactions sound as if they are drug-induced. Today he seemed sedated, perhaps intoxicated (cannabis). He talked about being very forgetful and did not perform very well on the thought and memory questions. His remote recall was fair. He appears to be of low average intelligence. He repeated five digits forward and two in reverse. He did not remember any recent memory items. He was weak and accurate on grocery store arithmetic. He understood two of three daily-problem solving situations but not proverbs.

*Id.* at 437.

Dr. Boggs observed that Ingram's "life has been destroyed by drugs" and his "mental health recidivism appears to be directly related to his drug relapses.  Until he is able to stop the drugs altogether his psychiatric problems will be chronic.  He has no tolerance for the street drugs and of course has no business mixing them with his psychotropics." *Id.* at 438.  Dr. Boggs diagnosed Ingram with a drug-induced mood disorder with psychosis, and polydrug dependence.  *Id.*

In September 2008, Ingram reported to Weems Community Health Center that he had stolen $400.00 from his father and spent it on crystal methamphetamine.  *Id.* at 537.  Ingram indicated that he was hearing voices telling him to do harmful things to himself and others.  *Id.*  A nurse practitioner observed that Ingram was "clearly psychotic, he is clearly coming down off crystal meth, he is very nervous, he is anxious, he is hearing voices . . . ." *Id.*

In October and November 2008, Ingram completed a twenty-eight day chemical dependency program at EMSH.  *Id.* at 453.  "He remained sober throughout his stay with no behavioral problems. . . . Mr. Ingram attended all activities in the unit which included individual and group counseling, speaker meetings, Twelve Step study and relapse prevention, biopsychosocial evaluation, socialization program and other activities." *Id.*  He was discharged with diagnoses of polysubstance dependence (crystal methamphetamine, cocaine, and marijuana), history of alcohol abuse, and history of major depressive disorder.  *Id.*  Ingram was advised to attend and participate in Alcoholics Anonymous and Narcotics Anonymous meetings.  *Id.*

In January 2009, Ingram was committed and treated at EMSH for 76 days on the affiant testimony of his father who averred that Ingram was depressed, paranoid, and not taking his medicine. *Id.* at 454. Upon admission, Ingram tested positive for benzodiazepine and cannabinoids. *Id.* at 499. He attended "dual diagnosis groups as scheduled" and expressed interest in group home placement. *Id.* at 457. It was noted that during treatment, Ingram was cooperative, had "no suicidal or homicidal ideation at this time," "[n]o recurring of auditory hallucinations," and "less difficulty organizing his thoughts." *Id.* at 501. Ingram was discharged with twelve medications and diagnoses of "major depressive disorder, recurrent, severe with psychotic features," "polysubstance dependence (crystal meth, amphetamines, benzodiazepines, cannabis, cocaine)," and an anxiety disorder. *Id.* at 458. On March 23, 2009, Ingram was admitted to Enterprise Group Home where he stayed six months before being kicked out after a positive drug test. *Id.* at 25, 459, 500, 532.

In May 2009, Glenda Scallorn, M.D., a non-examining psychiatrist, completed a Psychiatric Review Technique form for Ingram at the request of DDS. *Id.* at 515-527. Dr. Scallorn concluded that Ingram's mood and anxiety disorders were substance induced. *Id.* at 518, 520. Dr. Scallorn opined that "[p]resently clmt shows inability to live independently due to inability to remain drug free, but functioning level off drugs show[s] only mild limitations." *Id.* at 527. 2009 medical records from Weems Community Mental Health Center reflect diagnoses of polysubstance dependence and substance-induced bipolar disorder. *Id.* at 533.

In March 2010, Ingram was referred by his attorney to Dr. Kenneth R.

Schneider, a psychologist, "to assist in determining [Ingram's] eligibility for benefits."

*Id.* at 571. Dr. Schneider's report provides:

> Bobby's academic performance in school was abnormal, with failure in every subject. He was 15 years old in 6th grade. Clearly, mental retardation and learning disability characterized his school years. He dropped out in 6th grade, as they were placing him in Special Education classes.
> . . .
>
> Before 1 year and 3 months ago, Bobby was addicted to and abused crystal meth for 10 years. . . . Two of his hospitalizations at EMSH were for meth addiction.
>
> . . .
>
> This individual is mentally retarded but his cognitive abilities, concentration and short term memory are profoundly absent due to an overlay of extreme paranoia which dominates his thoughts. He misrepresents the intentions of others and is likely to be violent in any workplace, as well as being unable to attend to instructions. Mood swings of his Bipolar Disorder cause unpredictable motivation, awareness, energy, and even will to live. It is my opinion that he is 100% and permanently disabled, and has been unable to sustain employment all of his life. His father must handle his son's benefits.

*Id.*

Dr. Schneider administered to Ingram the Wechsler Adult Intelligence Scale ("WAIS"), which yielded a full scale IQ score of 57. *Id.* at 573. Dr. Schneider diagnosed Ingram with "bipolar disorder with psychosis, severe, chronic," "mild mental retardation," and "social ostracization due to mental illness." *Id.* Dr. Schneider did not diagnose Ingram with drug dependence or relate any of Ingram's mental difficulties to drug use.

In March 2011, Ingram voluntarily entered Central Mississippi Residential Center ("CMRC") for ten days of treatment with chief complaints that he had gotten off of his medications, had relapsed on crystal methamphetamine, and was hearing voices. *Id.* at 590, 593. Ingram was discharged with diagnoses of schizoaffective disorder, depressed, and cannabis and amphetamine abuse. *Id.* at 590. By the time of his follow-up appointment on April 13, 2011, Ingram had relapsed again on crystal methamphetamine and marijuana. *Id.* at 652. In July 2011, Ingram was committed to EMSH for the tenth time, complaining that he was hearing things, had stopped taking his medication, and had relapsed "big time" on crystal methamphetamine. *Id.* at 689.

Ingram arrived at UMC via ambulance on January 31, 2012, complaining of being off his psychiatric medications and hearing voices telling him to kill himself. *Id.* at 748. Ingram was hospitalized for four days with discharge diagnoses of polysubstance dependence and substance-induced mood disorder. *Id.* at 744-45. Records note that Ingram "seemed to be drug seeking . . . . If continued with suicidal ideation, admission note states that we may consider MSH commitment for long-term treatment. This also could be a justification effort to seeking disability. He has a lawyer and he mentioned at this time his court case is pending." *Id.* at 746. "He seemed to be dramatizing during [sic] especially in the rounds. . . . Knowledge and intelligence was average." *Id.* at 746-47.

Ingram was admitted to CRMC on February 9, 2012, because he "couldn't get my medication filled." *Id.* at 771. Ingram indicated that he had used crystal

methamphetamine "4-5 days ago." *Id.* at 772.  Ingram remained at CRMC twelve

days and was discharged with diagnoses of schizoaffective disorder and cannabis and

amphetamine abuse.  *Id.* at 759, 762.

Ingram was referred by DDS for a psychological evaluation by psychologist

Stella W. Brown, Ph.D., on March 12, 2012.  Ingram told Dr. Brown that he had

schizoaffective disorder, anxiety and depression, was hearing voices every other day,

and considered suicide.  *Id.* at 575.  Ingram was not truthful when he told Dr. Brown

that he had been hospitalized eight or nine times at EMSH but *only one of those times*

was due to chemical dependency and the rest were due to "hearing voices in my head."

*Id.*  Ingram represented that he had not abused drugs for the last six to eight months.

*Id.* at 575, 582.  Ingram indicated "that he tried alcohol once when he was 16 years

old but disliked this substance of abuse and never used it again."  *Id.* at 576.  To Dr.

Brown, Ingram "denied a history of any problems related to his drug use," but also

"stated that he has had problems with his ability to focus ever since he was 'on meth

bad . . . messed up.'"  *Id.*

Dr. Brown's report provides that Ingram "did not always seem cooperative or

very task-oriented.  At times after he indicated he could not perform a task or give a

response to an assessment, he demonstrated the ability to do so when limits were

tested."  *Id.* at 574.  "There was no clear evidence today of delusions, hallucinations,

or formal thought disorder . . . just disinterest . . . ."  *Id.* at 580.  "He indicated that he

had a learning disorder while a student in school and indeed may have been

somewhat of a slow learner though perhaps not so slow as might be indicated by his

-10-

performance on measures administered today." *Id.* at 582.  Dr. Brown observed that Ingram "seemed most interested in portrayal of himself in the most negative manner." *Id.*

Dr. Brown administered WAIS, which yielded a full IQ score of 47.  *Id.* at 580. Dr. Brown's report provides that the IQ score is not reliable and is "considered to be an underestimate of the constructs assessed and most useful as an indication of the client's disinterest in cooperation with academic-like tasks and people in positions of authority." *Id.* at 581.  Dr. Brown diagnosed Ingram with polysubstance dependence, reported to be in some form of remission at this time.  *Id.* at 583.  Dr. Brown concluded that "[a]t a minimum, the client seems to have problems consistent with features of polysubstance dependence relative to abuse of crystal methamphetamine and marijuana per his report." *Id.*

Ingram's attorney requested that psychologist Jennifer Whitcomb, Ph.D., evaluate Ingram, which she did on July 24, 2012.  Ingram told Dr. Whitcomb that he was drug free after twenty-three years of abuse.  *Id.* at 795.  Dr. Whitcomb administered WAIS, which yielded a full IQ score of 53.  *Id.* at 796.  Dr. Whitcomb concluded that Ingram was "in the Mentally Deficient" or moderately mentally retarded range.  *Id.*  Dr. Whitcomb's report provides: "Bobby appears to suffer from an anxiety disorder based on treatment history (from patient).  Schizophrenia needs to be ruled out due to behavior during examination and historical information." *Id.* at 797.  Like Dr. Schneider, Dr. Whitcomb did not diagnose Ingram with drug dependence or relate any of his mental problems to drug use.

-11-

In August 2012, Ingram was admitted to EMSH on an affidavit of commitment by his brother-in-law and remained sixty-three days.  *Id.* at 802.  Upon admission, he tested positive for cannabinoids, crystal methamphetamine, opioids, and benzodiazepine.  *Id.* at 805.  He demanded to be prescribed benzodiazepine.  *Id.* at 804.  He was discharged with diagnoses of substance-induced psychosis and mood disorder, and polysubstance dependence.  *Id.* at 807, 811-12.

B.    Procedural History

Ingram's SSI claim was denied initially and on reconsideration.  Ingram timely filed a request for hearing before an ALJ.  An administrative hearing before ALJ Regina Warren was held on June 23, 2010.  Warren issued a decision denying Ingram's application and finding Ingram capable of performing a full range of work at all exertional levels but with nonexertional limitations including "limited to simple routine and repetitive tasks . . . ."  *Id.* at 34-45.  ALJ Warren found that Ingram "suffers with depressive and anxiety symptomatology and polysubstance abuse" but was capable of making a successful adjustment to other work existing in significant numbers in the national economy, including hand packager and assembler of small products.  *Id.* at 134, 140.

Ingram requested a review by the Appeals Council.  The Appeals Council vacated ALJ Warren's hearing decision and remanded Ingram's case for further proceedings.  *Id.* at 146-148.  The Appeals Council ordered that Ingram's claim be evaluated under Listing 12.05 (mental retardation) due to Dr. Schneider's diagnosis of mild mental retardation and the full scale IQ score of 57 obtained by Ingram when

testing with Schneider.  *Id.* at 138, 146.  The Appeals Council ordered that if the ALJ determined that Ingram was disabled, the ALJ was to then determine "whether drug addiction or alcoholism is a contributing factor material to a finding of disability."  *Id.* at 146; *see* 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 416.935.

Ingram's case was heard on remand by ALJ Wallace E. Weakley.  A hearing was held on January 9, 2013.  Ingram and Jerald Everett, a vocational expert witness ("VE") testified.  At step one, the ALJ found that Ingram had not engaged in substantial gainful activity at any time pertinent to the decision.  R. [10] at 19.  At step two, the ALJ found that Ingram had the following severe impairments: "an organic mental impairment with ongoing drug abuse (20 C.F.R. § 416.920(c))."  *Id.*  At step three, the ALJ determined that Ingram did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, 20 C.F.R. Part 404, Subpt. P, App. 1.  The ALJ evaluated Ingram's impairments under Listing 12.02 (organic mental disorders), 12.05 (mental retardation), and 12.09 (substance addiction disorders).  *Id.* at 30-31.

The ALJ concluded that, [while the claimant continues to abuse drugs and alcohol, he is unable to perform any jobs which exist in significant numbers in the national economy due to his borderline intellectual functioning and continuing drug abuse. (20 C.F.R. § 417.935)."  *Id.* at 33.  The ALJ determined "that when the claimant is abusing drugs, he is unable to maintain adequate concentration and attention to perform any work eight hours per day, five days per week, or an equivalent schedule.  It is apparent the claimant has an ongoing drug abuse problem .

-13-

. . . He has been unable to go any significant amount of time without relapsing into drug abuse." *Id.*

The ALJ went on to determine that Ingram would have a substantially greater residual functional capacity ("RFC") if he stopped abusing drugs and alcohol. *Id.* The ALJ found that if Ingram discontinued abusing alcohol and drugs, he would have the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited by the inability to perform more than simple, routine, repetitive tasks not requiring exposure to the general public." *Id.* at 33-34. Relying on the VE's testimony, the ALJ concluded that if Ingram discontinued abusing drugs and alcohol, he would be able to perform the requirements of work existing in significant numbers in the national economy, including vehicle cleaner, poultry hanger, or kitchen helper. *Id.* at 38.

The ALJ found Ingram's impairments disabling but concluded that Ingram's continued use of drugs and alcohol was a contributing factor material to the finding of disability. *Id.* at 37. On this basis, Ingram's application for SSI was denied. The ALJ emphasized that Ingram's lack of credibility factored into his decision: "The inconsistencies in the claimant's allegations are so numerous, so grossly inconsistent and so pervasive throughout the record as to render the claimant's allegations, and behavior, wholly and completely unpersuasive. His allegations, both before the undersigned and to multiple treating physicians and psychologists are, essentially, completely without merit." *Id.* at 36. "[T]he claimant has misrepresented his condition on so many occasions as to render his allegations unworthy of belief." *Id.* at

-14-

35.

ALJ Weakley's decision was issued on February 14, 2013.  The Appeals Council denied Ingram's request for review on April 22, 2014.  Having exhausted his administrative remedies, Ingram commenced the present action by Complaint filed May 13, 2014.

## II.  STANDARD OF REVIEW

A review of the Commissioner's denial of benefits is limited to two inquiries: (1) whether the decision is supported by substantial evidence in the record as a whole, and (2) whether the Commissioner applied the correct legal standards.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence must be more than a mere scintilla, but it need not be a preponderance.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

The Court's role is to scrutinize the entire record to ascertain whether substantial evidence supports the Commissioner's findings.  *Hollis v. Bowen,* 837 F.2d 1378, 1383 (5th Cir. 1988).   The Court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  *Id.*  This is so, even if the Court determines that the evidence could allow for a different finding.  *Strickland v. Harris,* 615 F.2d 1103, 1106 (5th Cir. 1980).  Conflicts in the evidence are to be resolved by the Commissioner.  *Laffoon v. Califano,* 558 F.2d 253, 254 (5th Cir. 1977).

As summarized by the United States Court of Appeals for the Fifth Circuit,

> [t]he claimant has the burden of proving she has a medically determinable physical or mental impairment lasting at least twelve months that prevents her from engaging in

substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A).
Substantial gainful activity is defined as work
activity involving significant physical or mental abilities for pay or
profit. 20 C.F.R. § 404.1572(a) and (b). The ALJ uses a
five-step sequential process to evaluate claims of disability
and decides whether: (1) the claimant is not working in
substantial gainful activity; (2) the claimant has a severe
impairment; (3) the claimant's impairment meets or equals
a listed impairment in Appendix 1 of the Regulations; (4) the
impairment prevents the claimant from doing past relevant
work; and (5) the impairment prevents the claimant from
doing any other work. 20 C.F.R. § 404.1520.

The claimant bears the burden of proof on the first four steps
and the burden shifts to the Commissioner for the fifth step.
Thus, the claimant must show first that she is no longer
capable of performing her past relevant work. 20 C.F.R. §
404.1520(e). If the claimant satisfies this burden, then the
Commissioner must show that the claimant is capable of
engaging in some type of alternative work that exists in the
national economy. *See Chaparro v. Bowen*, 815 F.2d 1008,
1010 (5th Cir. 1987). Once the Commissioner makes this
showing, the burden of proof shifts back to the claimant to
rebut this finding. *Id.*

*Newton v. Apfel*, 209 F.3d 448, 452–53 (5th Cir. 2000).

## III. <u>ANALYSIS</u>

A.   <u>Listing 12.05(B)</u>

At step three, the Commissioner considers the medical severity of the

claimant's impairment(s) and determines whether the impairment(s) "meets or

equals" a listing. 20 C.F.R. § 416.920(a)(4)(iii), (d). Ingram asserts that the ALJ

erred when he found that Ingram did not meet or equal Listing 12.05B (mental

retardation). It is Ingram's position that he would be disabled due to mental

retardation even if he forever ceased using drugs and alcohol. R. [10] at 88.

"The regulations recognize that certain impairments are so severe that they prevent a person from pursuing any gainful work." *Heckler v. Campbell,* 461 U.S. 458, 460 (1983). A claimant who establishes that he suffers from an impairment listed in 20 C.F.R. pt. 404, subpt. P, App. 1, will be considered disabled without further inquiry. *Id.* The listings

> are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in term of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.

*Sullivan v. Zebley,* 493 U.S. 521, 529 (1990).

The burden of proof is on the claimant to establish that he meets a listing, and that burden is "demanding and stringent." *Falco v. Shalala,* 27 F.3d 160, 162 (5th Cir. 1994). The responsibility for determining whether a claimant meets a listing is reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2).

Listing 12.05 consists of an introductory paragraph or "capsule definition," setting forth the diagnostic criteria for mental retardation, followed by four "severity prongs" (paragraphs A through D). In order to satisfy Listing 12.05, the claimant must meet both the capsule definition and one of the four severity prongs. *Randall v. Astrue,* 570 F.3d 651, 659 (5th Cir. 2009). Ingram maintains that he meets Listing 12.05B.

> *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning

with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

B.  A valid, verbal, performance, or full scale IQ of 59 or less.

20 C.F.R. 404, Subpt. P, App. 1, § 12.05B.

    1.  <u>Significantly Subaverage General Intellectual Functioning</u>

The ALJ found that Ingram did not meet Listing 12.05 because he does not have "significantly subaverage general intellectual functioning."  The ALJ determined that Ingram "suffers from the organic mental impairment of borderline intellectual functioning," not mental retardation: "[T]he claimant *may* have some subnormal intellectual functioning, but this is no more than in the borderline range of intellectual functioning."  R. [10] at 30-31.  The ALJ found that Ingram "suffers from subpar intellectual functioning due to a history of drug abuse, as he testified."  *Id.* "[A]s thoroughly documented throughout the extensive medical records as discussed in detail above, the claimant's primary problem is that of polysubstance dependence." *Id.* at 35.

The ALJ set forth the evidence supporting his findings.  He noted Ingram's own testimony:

    ALJ: What's wrong with your mind?

    Ingram: I can't think straight.  I can't concentrate no more.

-18-

> ALJ: You think drugs had something to do with your mind being in the condition it's in?
>
> Ingram: Yes, sir.  I really do.  It's messed my mind up bad, sir.  I can't function right no more.

*Id.* at 58.

> ALJ: Okay.  What's the longest time period you've gone without using drugs?
>
> Ingram: Seven, eight months.
>
> ALJ: Remember when that was?
>
> Ingram: No, sir.  I can't remember.  That crystal meth has done messed my mind up.  I can't remember straight.  I can't remember nothing.  I can't hardly – my memory is gone.

*Id.* at 63.

The ALJ cited to medical evidence.  In 1999, a doctor at EMSH observed that Ingram's intellectual functioning was average.  *Id.* at 340.  In 2000, a psychiatrist at EMSH found that, while Ingram's judgment and insight were poor, Ingram was "[i]ntellectually functioning in the normal range." *Id.* at 343.  A 2003 discharge summary from EMSH provides that Ingram's "intellectual functioning appeared average." *Id.* at 349.  At SMSH in 2006, Ingram was diagnosed with "borderline intellectual functioning." *Id.* at 355.  2006 medical records from Weems Community Mental Health Center reflect a diagnosis of borderline intellectual functioning.  *Id.* at 399, 409.  EMSH records from 2007 provide: "No mental retardation noted." *Id.* at 379.  Dr. Boggs' stated in his 2008 report that Ingram "appears to be of low average intelligence. . . . His mental health recidivism appears to be directly related to his drug relapses." *Id.* at 437.

In 2011, a physician with CMRC found that Ingram was of average intelligence with fair reasoning. *Id.* at 595. In February 2012, Ingram was diagnosed upon admission at UMC with borderline intellectual functioning. However, after it was realized that Ingram was engaging in drug-seeking behavior or disability justification behavior, Ingram's knowledge and intelligence was estimated as average and the diagnosis of borderline intellectual functioning was removed. *Id.* at 30, 744, 747.

None of Ingram's treating sources have diagnosed him with mental retardation. *Id.* at 37. Only Dr. Schneider and Dr. Whitcomb, examining psychologists requested by Ingram's attorney, have diagnosed Ingram with mental retardation. *Id.* at 571, 573, 796-99. Dr. Schneider diagnosed Ingram with mild mental retardation, and Dr. Whitcomb diagnosed Ingram as moderately mentally retarded. The ALJ explained that he discounted Dr. Schneider's and Dr. Whitcomb's opinions:

> [T]he undersigned has not accorded the opinions of Doctors Schneider and/or Whitcomb significant weight. Although they did examine the claimant, their opinions appear to accept the claimant's statements at face value, without questioning the accuracy or the claimant's motivation for making the statements he did. When this fact is considered, neither psychologist provided a good explanation as to the rationale supporting their opinions. . . . [T]heir opinions appear to be generally inconsistent with the remainder of the record.

*Id.* at 37.

The record supports the ALJ's finding. *Id.* at 37. The reports of Dr. Schneider and Dr. Whitcomb reflect that Ingram was not wholly truthful in his representations to them. Ingram told Dr. Schneider that only two of his hospitalizations were for

crystal methamphetamine addiction. *Id.* at 571. Ingram told Dr. Whitcomb that he was in special education classes during the whole time he was in school. *Id.* at 795. Ingram was not forthcoming with Dr. Whitcomb when she inquired about his work history. *Id.* The reports of Dr. Schneider and Dr. Whitcomb scarcely mention Ingram's drug use. Neither attributed any of Ingram's mental difficulties to drug use. *Id.* at 33. Both proceeded under the assumption that Ingram had ceased using drugs. In contrast, over two decades of medical records reflect that Ingram "has been unable to go any significant amount of time without relapsing into drug use." *Id.* As found by the ALJ, Dr. Schneider's and Dr. Whitcomb's reports are generally inconsistent with numerous treating sources' diagnoses over the years attributing Ingram's mental problems primarily to his drug use.

Because it is supported by substantial evidence, the ALJ's conclusion that Ingram is in the borderline intelligence range and not mentally retarded is conclusive. This is so regardless of whether the evidence could allow for a different finding. *Strickland,* 615 F.2d at 1106. "Conflicts in the evidence, including those arising in medical opinions, are to be resolved not by the courts, but by the Secretary." *Laffoon,* 558 F.2d at 254. Ingram does not meet Listing 12.05 because he does not have "significantly subaverage general intellectual functioning." Further analysis under Listing 12.05 is not required because Ingram did not meet this threshold requirement.

2. <u>Adaptive Functioning</u>

Listing 12.05's capsule definition requires a claimant to demonstrate (1)

deficits in adaptive behavior (2) initially manifesting before age 22.  20 C.F.R. § 404,

Subpt. P, App. 1, § 12.05.  Adaptive activities include "cleaning, shopping, cooking,

taking public transportation, paying bills, maintaining a residence, caring

appropriately for your grooming and hygiene, using telephones and directories, and

using a post office."  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)1; *see Arce v.*

*Barnhart,* 185 F. App'x 437, 438-49 (5th Cir. 2006).  The ALJ is required to consider a

claimant's adaptive functioning both before and after the age of 22.  *Norwood v.*

*Astrue,* No. 3:12cv66-HTW-LRA, 2013 WL 959937, *3 (S.D. Miss. Feb. 22, 2013)(citing

*Randall,* 570 F.3d at 657-59).  "The Listing, by its very nature, presumes that the

plaintiff will show that the adaptive functioning, while originally and necessarily

manifesting at a young age, is *currently* present."  *Id.* (citation omitted)(emphasis

supplied).

     The ALJ found that Ingram does not display the significant adaptive

functioning deficits required to meet the mental retardation listing.  To Dr. Brown in

2012, "[Ingram] stated that he attends to personal hygiene and grooming without

assistance if he cares to do so."  R. [10] at 579.  Ingram performs household tasks,

such as taking out the trash, sweeping, yard work, laundry, preparing simple meals,

and washing dishes.  *Id.* at 30, 109, 274, 579, 642.  Ingram can operate a stove,

microwave, telephone, television, DVD player, and vending machine.  *Id.* at 72, 436,

578-79, 642.  Ingram has been married and divorced twice and has a child.  *Id.* at 30,

577.  Though he now resides with his father and claims to be almost entirely reliant

upon him for all of life's responsibilities, Ingram resided in an apartment with his

second wife when he was 24 or 25 years old.  *Id.* at 66, 577.  Ingram indicated to Dr. Whitcomb that he and his father "coexist."  *Id.* at 705.

Ingram passed a driver's test and obtained a driver's license at age 19 or 20. *Id.* at 56, 578.  He can drive both automatic and manual transmissions.  *Id.*  Ingram's license is suspended because he failed to pay child support, not because he is incapable of driving.  *Id.* at 29, 31, 56, 387.[1]  Though Ingram has reported and testified that he has no friends and spends time alone due to paranoia, he represented to Dr. Boggs in 2008 that he "visits friends" and told Dr. Brown that he has never paid for crystal methamphetamine or marijuana because friends buy those drugs for him.  *Id.* at 66, 436, 575.[2]  Ingram stated that he enjoyed hunting, fishing, and walking for leisure until the age of 33, when he lost interest and "started hearing voices in my head."  *Id.* at 30, 667, 100, 393, 578.

Ingram's father reported that Ingram goes "every day out in the community" and gets along well with authority figures.  *Id.* at 278.  Ingram's father also reported that when Ingram was living in a group home, he spent time with the people at the group home and went to meetings everyday.  *Id.* at 272, 277.  In 2008 at EMSH,

---

[1]In 2003, when Ingram was 29, he admitted to EMSH staff that he had driven with a suspended license.  *Id.* at 348, 578.  In 2008, Ingram told Dr. Boggs that "[h]e has had motor vehicle accidents and still has his license but has not driven in a year.  His father prefers that he not do so."  *Id.* at 436.

[2]Weems Mental Health Center records from 2007 provide: "He reports that his brother was actually making his crystal meth for him.  His brother is currently in prison serving five years for manufacturing of controlled substance."  *Id.* at 387. At the second ALJ hearing in 2013, Ingram testified that he "sometimes" gets crystal methamphetamine from his brother, but he denied that his brother "cook[ed] it."  *Id.* at 58.

during a time when Ingram was briefly sober, he "attended all activities in the unit which included individual and group counseling, speaker meetings, Twelve Step study, and other activities." *Id.* at 453.  Ingram has attended Narcotics Anonymous meetings in his community, sometimes twice a week, which he testified "help[ed] me a lot." *Id.* at 30, 62, 71.

When asked by the first ALJ what decisions he makes, Ingram testified, "[g]etting my medicine." *Id.* at 112.  Dr. Brown noted that Ingram was able to name each of his five medications and their doses from recall and name which sources prescribed each medication.  *Id.* at 574.  The ALJ noted Ingram's abilities in this area as well, as the ALJ detailed instances of Ingram's drug-seeking behavior and stated that "it appears that the claimant's 'standard routine' when he decides he needs treatment and/or drugs and/or to document his alleged disability, is to allege that he is hearing voices telling him to kill himself . . . ." *Id.* at 34-36.  The ALJ noted "it does not appear that the claimant has ever made a *legitimate* suicide attempt despite alleging suicidal ideation at nearly every hospitalization." *Id.* at 36 (emphasis supplied).

The ALJ also considered Ingram's work history.  Work history is often considered when evaluating adaptive functioning.  *See Vaughan v. Shalala,* 58 F.3d 129, 131 (5th Cir. 1995)(noting that claimant was able to work for several years while suffering from impairments she now asserted were disabling).  The ALJ's decision provides: "[D]espite [Ingram's] unpersuasive allegations since that time, he has previously reported a nine-consecutive year work history in construction and roofing

in association with his previous applications, which were completed before the drugs the claimant has taken over the years had fully taken their toll."  R. [10] at 31.

In an undated Work History Report, Ingram represented that he worked as a roofer from 1993 to 1998, eight hours per day, five days per week.  *Id.* at 256, 262-63. Earnings records reflect that Ingram had reported income from 1990 through 2000, and in 2002 and 2004.  *Id.* at 226, 246-47.  In 1991, the year after he quit school, Ingram earned $8,121.39.  *Id.* at 226.  This was Ingram's highest reported earnings year, and it occurred when Ingram was sixteen and seventeen years old.

Ingram has reported or testified that he has worked intermittently in poultry plants, making windshield parts, and last worked "on a cleanup crew" in 2010.  *Id.* at 59, 95, 387, 405, 436, 512, 532, 577.  Ingram testified that he has never been fired from a job but always quit.  *Id.* at 30, 60.  Though Ingram has reported various reasons for quitting work, in 2006 and 2007, Ingram told staff at Weems Community Mental Health Center that he stopped working because of drug use.  *Id.* at 391, 405.[3]

Ingram submits that this case should be remanded because Ingram's school records were not considered by the ALJ, and they show deficits in adaptive functioning initially manifesting before the age of 22.  Pl.'s Reply [15] at 6.  Ingram relies on the American Psychiatric Association's Diagnostic and Statistical Manual of

---

[3]Other reasons Ingram has given for quitting work include, "I go into psychosis.  I start hearing voices," *Id.* at 96.  He gets "stressed out" and "[t]hey had to constantly show me how to do" even simple jobs.  *Id.* at 57, 95-96.  In 2008, he reported that he had difficulty maintaining employment "because I couldn't concentrate on my jobs."  *Id.* at 512.  Ingram testified that he discontinued roofing because he was too weak to pick up shingles due to Hepatitis C, which he contracted either through intravenous drug use or tattoos.  *Id.* at 30, 575.

Mental Disorders (Text Revision, 4th ed. 2000)("DSM-IV-TR"), which provides that the essential criterial for mental retardation is significantly subaverage general intellectual functioning accompanied by "[c]oncurrent deficits or impairments in at least two of the following areas: communication, self-care, home living, social/interpersonal sills, use of community resources, self-direction, *functional academic skills*, work, leisure, health, and safety."  DSM-IV-TR at 49 (emphasis added).

      As an initial matter, the ALJ's decision does not indicate that the ALJ used DSM-IV-TR.  The Social Security Administration's definition of mental retardation "establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional [mental health] organizations." *Norwood,* 2013 WL 959937 at *3-4 (citing Technical Revisions to Medical Criteria for Determination of Disability, 67 Fed. Reg. 20018-01 (Apr. 24, 2002)).  The "age of onset and the method of measuring the required deficits in adaptive functioning" differ among the leading professional mental health organizations.  *Id.* (citation omitted). The age of onset for DSM-IV-TR is before 18 years of age, while Listing 12.05's is before 22 years of age.  "Functional academic skills" is not a term used in Listing 12.05 or cited as an example in the introductory material to the mental disorders listings ("cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.")  20 C.F.R., pt. 404, subpt. P, App. 1, § 12.00(C)1.

The school records consist of two pages and show that Ingram failed the first grade, third grade, and sixth grade twice before dropping out on his third attempt at sixth grade and joining Job Corps.  R. [10] at 309-310.  The school records indicate that Ingram made poor grades but do not reflect that Ingram was in special education classes.  *Id.*  The school records show that Ingram did not flunk out of school; he quit. *Id.*  Ingram relies on the following portion of the ALJ's decision as proof that the ALJ did not consider the school records:

> Although Dr. Whitcomb found the claimant to have a full scale IQ of 53, and the claimant has consistently reported he dropped out of the sixth grade, the credible evidence fails to establish the claimant displayed deficits in adaptive functioning in the developmental period.  The score obtained by Dr. Whitcomb appears to be based upon the fact she accepted the claimant's statements at face value, without questioning their motivation. *There could have been a number of reasons for dropping out of the sixth grade, and no school records were submitted to corroborate his allegations.*

*Id.* at 31 (emphasis added).

It is not definitive from the sentence highlighted above that the ALJ did not consider the school records.  The ALJ could be saying here that the school records do not prove Ingram's allegation that he dropped out of school due to academics.  The ALJ specifically referred to the school records at the hearing:

> Claimant's Attorney: [Opening statement] . . . But we argue that with his school grades and with this obvious IQ score that even if he stopped totally ever using any kind of drug again he'd still have his poor scores in school and his poor problems in school and these valid IQ scores. . . .
> . . .
>
> ALJ: Right, right, right.  Now, I think 11E, those are the

school records?

Claimant's Attorney: Yes, your honor.

ALJ: Thank you.

*Id.* at 54.

This exchange indicates that the ALJ considered the school records. Even if he did not review the two pages of school records, the ALJ was independently aware of most of the information in them. The ALJ's decision provides: "He dropped out of the sixth grade. He 'got to hanging around' with the wrong crowd, and started doing drugs. He repeated the sixth grade three times. He started using drugs at age 16." *Id.* at 29. Proving impairment in functional academic skills, furthermore, is not enough to satisfy the adaptive functioning requirements of DSM-IV-TR upon which Ingram relies. Pursuant to DSM-IV-TR, one must show deficits in *two* skill areas during the developmental period. Ingram submits that he exhibited deficits in "functional academic skills" and "work." *Id.* at 325. The ALJ noted Ingram's ability to work during the earlier years of his drug dependence before "the drugs . . . taken over the years had fully taken their toll." *Id.* at 31. Ingram reported the most earnings in the years before he attained the age of 22.

    3. <u>Severity Prong, Paragraph B</u>

The severity prong of Listing 12.05, Paragraph B, requires "[a] valid, verbal, performance, or full scale IQ of 59 or less." 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.05. Ingram presented the results of two IQ tests, one by Dr. Schneider and one by Dr. Whitcomb. Ingram obtained a full scale IQ score of 53 with Dr. Whitcomb and a

full scale IQ score of 57 with Dr. Schneider.  R. [10] at 796-97.  Dr. Brown also

administered WAIS but concluded that the results were not reliable due to Ingram's

noncooperation and malingering.  *Id.* at 581.

"IQ tests may overstate or understate the subject's actual level of intellectual

functioning."  *Moore v. Quarterman,* 342 F. App'x 65, 68 (5th Cir. 2009).  "An ALJ can

make factual determinations on the validity of IQ tests."  *Caradine v. Astrue,* No.

1:08cv305-DAS, 2009 WL 3769771, *4 (N.D. Miss. Nov. 10, 2009).  The ALJ addressed

Ingram's full scale IQ score of 53.  The ALJ found that a score of 53 did not reflect the

actual, factual functioning that Ingram had displayed.  R. [10] at 31.  The ALJ

specifically referenced Ingram's reported nine-consecutive-year work history in

construction and roofing and his "overall lack of credibility."  *Id.*  The ALJ cited to

Ingram's ability to operate a motor vehicle and pass a driver's test, "things an

individual with a valid IQ of 53 would simply be incapable of doing."  *Id.*  There is

substantial evidence supporting the ALJ's rejection of the full scale IQ score of 53.

Ingram takes issue with the fact that the ALJ's decision does not specifically

address the validity of the full IQ score of 57 obtained by Ingram during testing with

Dr. Schneider.  The ALJ criticized both Dr. Whitcomb and Dr. Schneider for

"accept[ing] the claimant's statements at face value, without questioning the accuracy

or the claimant's motivation for making the statements he did."  *Id.* at 37.  On this

basis, the ALJ specifically found that both Dr. Whitcomb's and Dr. Schneider's

opinions that Ingram is mentally retarded lacked supportability.  *Id.*

Though one could assume that the ALJ harbored the same concerns regarding

Ingram's credibility during Dr. Schneider's WAIS testing that he did Dr. Whitcomb's, this is not expressly stated in the ALJ's decision.  Any error in this apparent oversight is harmless because Ingram did not meet his threshold burden of establishing that he met the diagnostic criteria contained in Listing 12.05's capsule definition.

B.   <u>Drug and Alcohol Addiction as a Contributing Factor Material to Disability</u>

The ALJ denied Ingram's application for SSI because he found Ingram's drug and alcohol addiction to "be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  The Social Security Act provides: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).

Ingram maintains that "[t]he ALJ's failure to consider [the school records] crucially undercuts the ALJ's finding that, but for the Claimant's drug and alcohol use, he would not be disabled.  Without considering this evidence, the ALJ is unable to make a determination that significant mental limitations existed for Claimant prior to his use of drugs and alcohol . . . ."  Pl.'s Mem. [12] at 18.

As noted, establishing deficits in "functional academic skills" before the age of 22 is not enough to meet the adaptive functioning criteria for mental retardation. The record contains nearly two decades of medical records, replete with numerous treating medical providers' opinions that Ingram is drug dependent and experiences

mental problems that are drug-induced. Ingram testified that it was drugs that "messed my mind up," and he told Dr. Boggs that he felt "that the drugs may have started his psychotic episodes . . . ." *Id.* at 58, 63, 437. Ingram testified that he dropped out of school at age 16 because he started hanging out with the wrong crowd. *Id.* at 57, 387. Ingram has not been consistent in his statements regarding when he began using drugs, indicating at different times that he began at age sixteen, fifteen, fourteen, eleven, and seven. *Id.* at 342-43, 356, 381, 544, 745, 795. For nine consecutive years following the year he quit school, and earlier in his history of drug abuse, Ingram worked. Ingram's subnormal intellectual functioning was taken into consideration by the ALJ, who found that Ingram's intellectual functioning was borderline, and limitations to account for this impairment were included in the RFC analysis. *Id.* at 33-34. The above-cited evidence is more than substantial evidence supporting the ALJ's conclusion "that the claimant's continued use of drugs and alcohol is a contributing factor material to the finding of disability." *Id.* at 33; *see* 42 U.S.C. § 423(d)(2)(C).

## III.  RECOMMENDATIONS

For the reasons stated, it is recommended that Ingram's Motion for Summary Judgment [11] be denied and the Commissioner's Motion to Affirm [13] granted.

## IV.  NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Local Uniform Civil Rule 72(a)(3),

> After service of a copy of the magistrate judge's report and recommendations, each party has fourteen days to serve and file written objections to the report and recommendations. A

party must file objections with the clerk of court and serve
them upon the other parties and submit them to the assigned
district judge.  Within seven days of service of the objection,
the opposing party or parties must either serve and file a
response or notify the district judge that they do not intend
to respond to the objection.

L.U.Civ.R. 72(a)(3); *see* 28 U.S.C. § 636(b)(1).

An objecting party must specifically identify the findings, conclusions, and

recommendations to which he objects.  The District Judge need not consider frivolous,

conclusive, or general objections.  A party who fails to file written objections to the

proposed findings, conclusions, and recommendations within fourteen (14) days of

being served a copy shall be barred, except upon grounds of plain error, from

attacking on appeal any proposed factual finding or legal conclusion adopted by the

Court to which he did not object.  *Douglass v. United Servs. Automobile Assoc.,* 79

F.3d 1415, 1428-29 (5th Cir. 1996).

**SIGNED,** this the 3rd day of August, 2015.

*s/ John C. Gargiulo*
JOHN C. GARGIULO
UNITED STATES MAGISTRATE JUDGE